# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1628

_____

| | | |
|---|---|---|
| Pearl Cottier; Rebecca Three Stars, | * | |
| | * | |
| Appellees, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| City of Martin; Todd Alexander; | * | |
| Rod Anderson; Scott Larson; | * | |
| Don Moore; Brad Otte; Molly Risse, | * | |
| in their official capacities as members | * | |
| of the Martin City Council; | * | |
| Janet Speidel, in her official capacity | * | |
| as Finance Officer of the | * | |
| City of Martin, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: March 12, 2008
Filed:  December 16, 2008

_____

Before BYE, SMITH, and COLLOTON, Circuit Judges.

_____

SMITH, Circuit Judge.

In September 2002, the American Civil Liberties Union brought an action on behalf of two Native Americans ("plaintiffs") against the City of Martin, South Dakota, and various city officials in their official capacities (collectively "Martin"). Plaintiffs challenged Ordinance 122, which redistricted the Martin City Council ("city

council") ward boundaries, as intentionally and effectively diluting the voting strength of Native Americans and keeping Native American-preferred aldermen candidates from being elected in violation of Section 2 of the Voting Rights Act of 1964 (VRA) and the Fourteenth and Fifteenth Amendments to the United States Constitution. After a trial, the district court[1] denied relief, finding that plaintiffs had not met their burden of proving that the white majority in Martin usually voted as a bloc to defeat Native American-preferred candidates. A panel of this court disagreed and remanded the matter to the district court to complete the analysis required by the Supreme Court pursuant to Section 2 of the VRA as construed by *Thornberg v. Gingles*, 478 U.S. 30 (1986). *Cottier v. City of Martin*, 445 F.3d 1113 (8th Cir. 2006) ("*Cottier I*").

On remand, the district court held, based on the totality of the circumstances, that Ordinance 122 impermissibly diluted the Native American vote and violated Section 2 of the VRA. Consequently, the district court instructed Martin to submit a remedial proposal consistent with the district court's opinion. Martin failed to propose a remedial plan, instead arguing no possible remedy existed for the violation. In contrast, plaintiffs proposed three plans. Subsequently, in a remedial order, the district court adopted plaintiffs' Plan C, an at-large, cumulative voting scheme. Martin now appeals, arguing that the district court erred: (1) in finding that, under the totality of the circumstances, Ordinance 122 diluted the vote of Native Americans in Martin in violation of Section 2 of the VRA; and (2) in ordering remedial Plan C. We affirm.

## I. *Background*

Plaintiffs, Pearl Cottier and Rebecca Three Stars, are Native Americans, qualified electors, members of the Oglala Sioux Tribe, and residents of Martin, South Dakota. Martin is located in the southwestern part of South Dakota and is part of Bennett County, which is adjacent to the Pine Ridge and Rosebud Indian

---

[1]The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota.

Reservations. According to the 2000 census, Martin had a total population of 1,078 persons and a voting-age population (VAP) of 737 persons. The city is small in both population and land area; it covers slightly more than one half of a square mile. The Native American population in Martin is 485, which is 44.71% of the total population and 36% of the VAP.

As described by a prior panel in this case:

> For more than a decade Martin has been the focus of racial tension between Native-Americans and whites. In the mid-1990's, protests were held to end a racially offensive homecoming tradition that depicted Native-Americans in a demeaning, stereotypical fashion. Concurrently, the United States Justice Department sued and later entered into a consent decree with the local bank requiring an end to "redlining" loan practices and policies that adversely affected Native-Americans, and censuring the bank because it did not employ any Native-Americans. Most recently, resolution specialists from the Justice Department attempted to mediate an end to claims of racial discrimination by the local sheriff against Native-Americans.

*Cottier I*, 445 F.3d at 1115–16.

Historically, Martin was divided into three wards, each electing two city council members to staggered two-year terms on a non-partisan ballot. In addition, Martin has elected a mayor who ran at-large for a two-year term on a non-partisan ballot. The district court noted that the record is unclear as to when the ward lines were originally drawn but, by 2001, the wards had not been changed in 47 years and the wards within the city were not within the requisite variation of population.

Pursuant to South Dakota law, the city council had the power and duty to redistrict the ward boundaries following the decennial federal census. Martin contracted with Black Hills Council of Local Governments (BHCLG) to reconfigure

the wards so that they would comply with the one-person, one-vote requirement in the Equal Protection Clause of the Fourteenth Amendment, *see Reynolds v. Sims*, 377 U.S. 533, 562–63 (1964). Initially, BHCLG used incorrect population data in drawing the new wards, and so, on January 16, 2002, the city council, unaware of the errors, adopted the flawed redistricting recommendations submitted by BHCLG in Ordinance 121.

Once these new wards were published in the local newspaper, plaintiffs contacted their attorneys because they suspected the new boundaries were flawed. After analyzing the new boundaries in Ordinance 121, the attorneys concluded the new wards were severely malapportioned in violation of the one-person, one-vote principle. Counsel for plaintiffs also concluded that the new wards unlawfully fragmented the Native American population in violation of Section 2 of the VRA. In early March 2002, BHCLG received a letter detailing these concerns and Martin's Mayor, Bill Kuxhaus, was copied on the letter. The city council then asked BHCLG to redraw the wards to comply with the one-person, one-vote requirement, and a new map was submitted to the city council.

On March 12, 2002, plaintiffs' attorneys received a copy of the new redistricting plan, again drafted by BHCLG. Plaintiffs believed this revised plan did not fix the fragmentation problem, and they wrote a letter to the Mayor expressing this concern that same day. Despite the expressed concern, the city council proceeded to adopt the revised redistricting plan enacted as Ordinance 122. As has been done historically, Ordinance 122 divided Martin into three wards with no ward having a Native American majority. The district court created the following figure to summarize the total population and VAP under Ordinance 122:

**Ordinance 122 Statistics**

| Ward | Total Population | Indian Population | Percent Indian | VAP | Indian VAP | % Indian VAP |
|------|------------------|-------------------|----------------|-----|------------|--------------|
| 1 | 352 | 165 | 46.88% | 236 | 90 | 38.14% |
| 2 | 361 | 177 | 49.03% | 237 | 86 | 36.29% |
| 3 | 365 | 143 | 39.18% | 264 | 90 | 34.09% |

Ordinance 122 became effective on May 8, 2002, and it is the plan currently in effect in Martin.

In an attempt to prevent the city from implementing this new plan, Native American voters submitted a petition to have Ordinance 122 referred to the voters as a ballot issue. City Finance Officer Janet Speidel reviewed this petition and decided that the petition did not contain a sufficient amount of valid signatures. Speidel did not tell the petitioners that the signatures were insufficient until the deadline for petitioning ballot initiatives had passed.

On April 3, 2002, plaintiffs brought suit alleging Ordinance 121 violated the one-person, one-vote requirement, and the district court dismissed the complaint as moot because Ordinance 121 had been replaced by Ordinance 122, which the court found equally redistributed the population into three wards alleviating the one-person, one-vote problem. The district court also granted plaintiffs' motion to supplement its complaint. Plaintiff's supplemented complaint challenged Ordinance 122, as intentionally and effectively diluting the voting strength of Native Americans and keeping Native American-preferred aldermen candidates from being elected in violation of Section 2 of the VRA and the Fourteenth and Fifteenth Amendments to the United States Constitution.

Following an eleven-day bench trial, the district court found that plaintiffs had met the first two conditions of *Gingles*—plaintiffs met their burden of showing that a permissible remedy in the context of the challenged system could be fashioned and that Native Americans in Martin were politically cohesive. *Gingles*, 478 U.S. at 49–51. However, the district court also found that plaintiffs failed to prove, by a preponderance of the evidence, the third *Gingles* precondition—that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate"—and therefore, the district court entered judgment for Martin on the vote dilution claim. *Id.* at 51. The district court also found that plaintiffs could not prevail on their intent claim because there was no evidence that Ordinance 122 had been adopted and maintained for a discriminatory purpose.

Plaintiffs appealed, and a panel of this court reversed and remanded holding that the white majority in Martin usually voted in a way to defeat Native American-preferred candidates. We remanded, instructing the district court to complete the analysis required by *Gingles*, and "[i]f the district court then finds in favor of the plaintiffs, it shall develop a plan under which Native-Americans will have a reasonable opportunity to elect an Indian-preferred candidate." *Cottier I,* 445 F.3d at 1115.

On remand, the district court reviewed the Senate factors,[2] as well as other relevant circumstances such as proportionality, and found that, based on the totality of the circumstances, Ordinance 122 impermissibly diluted the Native American vote in violation of Section 2 of the VRA. Having concluded that Ordinance 122 violated the VRA, the court held that plaintiffs were entitled to a "full and complete remedy."

---

[2]In *Gingles,* the Supreme Court highlighted factors set out in the Senate report accompanying the VRA. These Senate factors were intended to assist in determining whether, under the totality of the circumstances, a challenged electoral scheme dilutes the minority vote. *Harvell v. Blytheville Sch. Dist. No. 5*, 71 F.3d 1382, 1385 (8th Cir. 1995).

Thereafter, the court gave Martin the first opportunity to propose a redistricting plan that would remedy the Section 2 violation.

Martin failed to propose a remedial plan, and, instead, argued that no remedy could be crafted for the violation. Because Martin refused to propose a remedy, in an order dated February 9, 2006, the district court found it could either fashion its own remedy or use a remedy proposed by plaintiffs. The district court chose to adopt plaintiffs' Plan C which the district court described as follows:

> In Plan C, Martin is not divided into aldermanic wards. Instead, Plan C adopts an at-large voting scheme using cumulative voting. (Docket 413-4). Martin will still have six city council members, elections for which will be held in a 3-3 staggered cycle. Elections will be held in 2007 for the three seats whose current members' terms expire in 2007. Elections will be held in 2008 for the remaining three seats. Candidates shall run as a field without designation of positions or number posts. Candidates can be from any part of Martin. Pursuant to the cumulative voting scheme, each voter will receive three votes. Each voter can cast one, all, or any whole number of his or her votes for any one or more of the candidates. No voter shall be required, however, to cast one vote, or any other minimum number of votes, for any candidate. Nor shall any voter be required to cast all of the votes available to that voter in a particular election. The winners of the election will be the three candidates that receive the highest number of votes.

*Cottier v. City of Martin*, 475 F. Supp. 2d 932, 936 (D. S.D. 2007).

The district court concluded that no form of municipal government authorized by South Dakota law—common council structure or board of commissioners—would remedy the Section 2 VRA violation in this case, and that Plan C was the proper remedy.

II. *Discussion*

Martin argues on appeal that the district court erred in: (1) finding that, under the totality of the circumstances, Ordinance 122 dilutes the vote of Native Americans in Martin, in violation of Section 2 of the VRA; and (2) ordering remedial Plan C.

A. *Section 2 Violation—Totality of the Circumstances*

Martin argues on appeal that the district court erred in finding that plaintiffs established, through the totality of the circumstances, a violation of Section 2 of the VRA. "The District Court's determination whether the § 2 requirements are satisfied must be upheld unless clearly erroneous. Where the ultimate finding of dilution is based on a misreading of the governing law, however, there is reversible error." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, —, 126 S.Ct. 2594, 2614 (2006) (internal citations and quotations omitted).

Using the clear error standard:

[W]e will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made. We give due regard to the district court's opportunity to judge the credibility of the witnesses. A district court's choice between two permissible views of evidence cannot be clearly erroneous.

*United States v. Vertac Chem. Corp.*, 453 F.3d 1031, 1039 (8th Cir. 2006) (internal citations and quotations omitted).

Section 2 of the VRA provides that a denial of the right to vote occurs when:

based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members

> have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred candidates." *Cottier I*, 445 F.3d at 1116 (quoting *Gingles*, 478 U.S. at 47).

In order to establish a Section 2 violation, plaintiffs must prove the following three elements—often referred to as the "*Gingles* preconditions"—by a preponderance of the evidence: "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial group is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (internal citation and modifications omitted).

In the first appeal, this court held that plaintiffs have proven all three *Gingles* preconditions by a preponderance of the evidence. *Cottier I*, 445 F.3d at 1122. Satisfying the three *Gingles* preconditions takes the plaintiff "a long way towards showing a section 2 violation," however, the analysis does not stop here. *Bone Shirt*, 461 F.3d at 1021 (quoting *Harvell*, 71 F.3d at 1390).

"If all three *Gingles* requirements are established, the statutory text directs us to consider the 'totality of circumstances' to determine whether members of a racial group have less opportunity than do other members of the electorate. The general terms of the statutory standard 'totality of circumstances' require judicial interpretation." *League of United Latin Am.Citizens*, 126 S. Ct. at 2614. The Senate Committee report accompanying the 1982 VRA amendment noted the following "inexhaustive, objective factors in determining whether the totality of the circumstances indicate a Section 2 violation":

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Bone Shirt*, 461 F.3d at 1021–22 (internal citations omitted). Also useful inquiries include "(1) was there a significant lack of response from elected officials to the needs of the minority group, and (2) was the policy underlying the jurisdiction's use of the current boundaries tenuous." *Id*. at 1022.[3]

---

[3]The district court also weighed the additional factor of proportionality. *See Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994). ("'Proportionality' as the term is used here links the number of majority-minority voting districts to minority members' share of the relevant population. The concept is distinct from the subject of the proportional representation clause of § 2 . . . .). Recently in *League of United Latin Am. Citizens v. Perry*, the Supreme Court held that proportionality is a relevant fact in the totality of the circumstances. 126 S. Ct. at 2620. Neither in their brief nor in oral argument does Martin discuss the district court's finding that, in the district court's opinion, proportionality weighed in favor of plaintiffs.

The two factors that predominate the totality analysis are "the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme." *Bone Shirt*, 461 F.3d at 1022 (quoting *Harvell*, 71 F.3d at 1390). The district court found that seven of the above factors weighed in plaintiffs' favor: history of voting-related discrimination; racially polarized voting; voting practices or procedures that tend to enhance opportunity for discrimination; effects of past discrimination in education, employment and health; success of minority candidates; lack of responsiveness; and proportionality.

The district court found the following two factors weighed in favor of Martin: denial of access to candidate-slating process (plaintiffs conceded there is not a formal slating process in Martin); and tenuousness of the city's policy drawing district lines (the court found Martin began the redistricting effort because it was obligated to do so after the 2000 census and that it was done to reduce an unacceptable level of variation in population among the three wards). According to the district court, the use of racial appeals in campaigns weighed in favor of neither plaintiffs nor Martin. The district court found that although there was some evidence that racial appeals were used, the court gave the evidence little weight because most involved elections outside of Martin.

As to the two primary factors in our totality of the circumstances analysis—"the extent to which voting is racially polarized and the extent to which minorities have been elected under the challenged scheme," *Harvell*, 71 F.3d at 1390—the record supports the district court's finding that these factors weigh in favor of plaintiffs. As the *Cottier I* panel acknowledged and the district court found on remand, the exit polls in the 2003 aldermanic election along with the loss of every Native American-preferred candidate since the adoption of Ordinance 122 strongly indicate racially

polarized voting in endogenous elections.[4] The 2003 exit polls revealed that in the aldermanic election in 2003 in ward I, 100% of Native Americans supported the Native American-preferred candidate but that candidate still lost; therefore, at most, only 25% of whites voted for that candidate indicating a high degree of polarization. The ward III exit polls showed that the Native American-preferred candidate received 86% of the Native American vote and still lost. Also, exit polls for the 2003 school board election revealed that two Native American-preferred candidates received 82.7% and 58.8% of the Native American vote and, at most, only 14.6% and 6.3% of the white vote—these candidates came in fourth and fifth out of six. Expert and non-expert witness testimony also indicated racially polarized voting in Martin.

Regarding the extent to which Native Americans have been elected under the challenged scheme, there is also substantial evidence in the record to support the district court's finding that Native Americans have rarely been elected to the city council and this factor weighs in favor of plaintiffs. The record indicates that four Native Americans have won a total of seven city council elections between 1981 and 2002 in Martin, and during that time there have been 29 elections for city council in ward I. The only Native Americans elected in ward I were Melva Marshall, who won a contested election in 1984 and Molly Risse, who was not a Native American-preferred candidate, who won a contested election in 2001.Ward II has had 26 elections and the only Native American elected was Dick Rose who ran unopposed in both 1991 and 1993. There have been 26 elections in ward III and only one Native American won (in 1994, 1995, 1997), and he ran unopposed. Therefore, out of 80 elections for city council, Native Americans have won only 7 elections (8.75%). This evidence shows that Native Americans have some limited success in seeking election, but, on the whole, success is rare. In 5 of the 7 successful elections, the Native American candidate ran unopposed. In 3 of the 5 unopposed successes by Native

---

[4]Endogenous elections are elections in the district at issue. *Cottier I*, 445 F.3d at 1121 n.5.

Americans, the candidate was incumbent. The district court's findings that this important factor weighs in favor of plaintiffs was not clearly erroneous.

The record also shows that Native Americans in Martin, Bennett County and South Dakota at large have faced a history of voting-related discrimination.[5] *See Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 1019 (D. S.D. 2004) ("South Dakota officially excluded Indians from voting and holding office until the 1940s. Even after state laws were repealed that expressly denied Indians the right to vote, as late as 1975 Indians were effectively denied the right to vote in certain county elections, and Indians in certain counties were denied the right to run for the office of county commissioner in violation of the equal protection clause until 1980") (internal citations omitted).

Further, the record also supports the district court's finding that Native Americans in Martin continue to suffer from the effects of past discrimination including lower levels of income, education, home ownership, automobile ownership and standard of living. "[P]olitical participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Gingles*, 478 U.S. at 69. We have explicitly recognized that Native Americans in South Dakota continue to bear the burden of past discrimination, which hinders their political participation.

---

[5]Martin argues that the district court erred in finding that this factor weighed in plaintiffs' favor because the district court's analysis was too broad and should only have looked at specific voting discrimination in Martin. However, the district court was correct that the long, elaborate history of discrimination against Native Americans in South Dakota and Bennett County in matters related to voting is relevant here. In fact, we have reversed district courts for failing to consider statewide discrimination in school district VRA cases. *See Buckanaga v. Sisseton Indep. Sch. Dist. No.54-5*, 804 F.2d 469, 474–75 (8th Cir. 1986). *See also Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1121–23 (5th Cir. 1991).

*See Bone Shirt*, 461 F.3d at 1022. As the district court found, this case is similar.[6] The record supports the district court's finding that Native Americans in Martin continue to suffer the effects of discrimination, including lower levels of income and education and that Native Americans in Martin suffer from depressed levels of political activity.[7]

We conclude that the district court's overall weighing of the totality of the circumstances was not clearly erroneous because the ultimate finding of dilution is not based on a misreading of the governing law, and it is supported by substantial evidence in the record. *Vertac Chem. Corp.*, 453 F.3d at 1039.

---

[6]As noted by the district court, according to Summary File 3 from the 2000 census containing socioeconomic data produced by the United States Census Bureau, 36.4% of Native Americans over 25 have not finished high school while only 16.1% of whites have not finished. The Native American drop-out rate is 21.4%, and it is 3.4% for whites. Only 9.7% of Native Americans have a college degree whereas 20.3% of whites have a college degree. The unemployment rate for Native Americans is 15.8% which is five times higher than white unemployment rate; median family income for Native Americans is $25,000 less than the white median income, and at least forty percent of Native American children lived in poverty while no white children were living in poverty. And, twice as many Native Americans as whites rent their homes; value of homes owned by Native Americans is lower; the percentage of income going to rent is higher for Indians; 18.2% of Indian homes in Martin lack telephones and 17.2% lacked access to a car, whereas 1.1% of white households were without a phone and 7.2% lacked a car.

[7]We note that, although not necessary for our ultimate holding, the district court's findings that Senate factors three and eight—voting practices or procedures that tend to enhance the opportunity for discrimination and unresponsiveness of elected officials to needs of Native Americans in Martin—weigh slightly in favor of plaintiffs (but are based on mixed evidence) are not clearly erroneous.

## B. Remedy—*Plan C*

Martin also argues on appeal that the district court erred in imposing Plan C because it lacked the authority to impose a remedial plan. Martin contends all plans proposed to the court were either unworkable, ineffective, or in violation of South Dakota law. We review the district court's remedial order for an abuse of discretion. *Bone Shirt*, 461 F.3d at 1017.

> The abuse of discretion standard means that a court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law. An abuse of discretion occurs if a relevant factor that should have been given significant weight is not considered, if an irrelevant or improper factor is considered and given significant weight, or if a court commits a clear error of judgment in the course of weighing proper factors.

*Aaron v. Target Corp.*, 357 F.3d 768, 774 (8th Cir. 2004) (internal citations and quotations omitted).

Upon finding a Section 2 violation, the district court must develop a constitutional remedy and give the defendant the first opportunity to submit a remedial plan. *Bone Shirt*, 461 F.3d at 1022; *Cottier I*, 445 F.3d at 1123. If the defendant refuses to submit a remedial plan, it is then up to the district court to fashion its own remedy or adopt a remedial plan proposed by the plaintiff. *Bone Shirt*, 461 F.3d at 1022.

"In formulating a remedial plan, the first and foremost obligation of the district court is to correct the Section 2 violation." *Id.* Second, the court's remedy should "achieve population equality while avoiding, when possible, the use of multi-member districts" and it should be narrowly tailored. *Id*. at 1022–23. Third, the remedial plan must not violate Sections 2 or 5 of the VRA. *Id*. at 1023. "Finally, the plan should not 'intrude on state policy any more than is necessary' to uphold the requirements of the

Constitution." *Id.* (quoting *Upham v. Seamon*, 456 U.S. 37, 41–42 (1982 ) (per curiam)).

In *Cottier I*, this court reviewed the district court's denial of relief to plaintiffs. *Cottier I*, 445 F.3d at 1116–22. Before that appeal, the district court had denied relief to plaintiffs on the basis that they had not established the third *Gingles* factor. Specifically, the district court ruled that plaintiffs had not established that the white majority usually voted in a way to defeat the Native American-preferred candidate.[8] The *Cottier I* panel reversed that decision in part, concluding that plaintiffs had established the third, and therefore all, *Gingles* factors. The prior panel affirmed the district court's finding that plaintiffs had met their burden under the first *Gingles* factor in establishing that the Native American community in Martin was sufficiently large and geographically compact to constitute a majority in a single-member district. *Id.* at 1118. In discussing the first *Gingles* factor the prior panel stated:

> The ultimate viability and effectiveness of a remedy is considered at the remedial stage of litigation and not during analysis of the *Gingles* preconditions. At the initial stage, the plaintiff must only show that "minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practices." *Gingles*, 478 U.S. at 50 n.17, 106 S. Ct. 2752; *see also Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 503 (7th Cir. 1991); *Houston v. Lafayette County*, 56 F.3d 606, 611(5th Cir. 1995). Although Martin argues the plans are not viable or stable, the ultimate end of the first *Gingles* precondition is to prove that a solution is possible, and not necessarily to present the final solution to the problem. *Gingles*, 478 U.S. at 50 n.17, 106 S. Ct. 2752.

---

[8]Footnote 4 of the March 22, 2005, district court opinion read "Plaintiffs proffer Illustrative Plan C as an alternative which would allow Indians to elect preferred candidates in numbers more proportional to the Indian population. Although Illustrative Plan C's limited voting plan cannot be a racial gerrymander, the court does not believe it has authority to order such a remedy. *Cane v. Worcester County, Maryland I and II*, 35 F.3d 921 (4th Cir. 1994). . . ."

*Id*. at 1117 (emphasis in the original). After holding that plaintiffs had established all three *Gingles* preconditions, the prior panel stated that it would remand the case to the district court to determine if plaintiffs were entitled to relief under the totality of the circumstances. *Id*. at 1122. The prior panel then stated:

> In the event the district court finds that under the totality of the circumstances, the plaintiffs are entitled to relief, the district court shall devise and implement a remedy that will give Native-Americans in Martin a reasonable opportunity to elect Indian-preferred candidates to alderman. In so doing, the defendant shall be given an opportunity to propose a remedy within a specified amount of time. *See Cane v. Worcester County, Md.*, 35 F.3d 921, 927 (4th Cir. 1994). The court should then review the proposed order to determine whether it is "legally unacceptable." *Id*. If the defendant fails to propose a legally acceptable remedy, the district court shall devise a plan that ensures that Indian-preferred candidates have a reasonable chance of prevailing in Martin municipal elections for alderman. *Among its options, the district court has the discretion to implement any of the three plans presented by the plaintiffs*.

*Id*. at 1123. (emphasis added). At the end of the above paragraph, in a footnote, the prior panel stated:

> We disagree with the district court's finding that it is unable to apply an at-large voting system in Martin. In *Cane*, the court considered the amount of deference due to a legislative policy decision underlying proposed electoral schemes. *Cane*, 35 F.3d at 927–28. Even where the legislative body fails to propose a plan or where the plan proposed is legally unacceptable, "the court, in exercising its discretion to fashion a remedy that complies with § 2, must to the greatest extent possible give effect to the legislative policy judgments underlying the current electoral scheme or legally unacceptable remedy offered by the legislative body." *Id*. at 928. *If, at the remedy stage, a redistricting of Martin's wards appears unworkable, it appears that plaintiffs' third plan would be a*

-17-

*viable option.* Whereas the plan in Cane completely eliminated elected positions, plaintiffs' at-large plan continues Martin's practice of staggering its aldermanic elections and maintains the current number of aldermen. Moreover, its current form of aldermanic government is by choice, not by legislative mandate. *See* S.D. Codified Laws §§ 9-11-5; 9-11-6. In essence, an at-large election would change Martin into a single ward rather than three wards. More importantly, an at-large system would conform Martin to the requirements of section 2 of the Voting Rights Act.

*Id*. at n.7. (emphasis added). In the remedial order at issue the district court explicitly stated that it was following our panel's decision as law of the case:

Defendants argue that South Dakota law prohibits the court from adopting Plan C. Specifically, defendants argue that Martin uses the common council form of municipal government, and that state law permits neither at-large districts nor cumulative voting in the common council structure. *See* SDCL 9-8-4. Defendants also argue that only the voters of Martin, not the court, can change Martin's form of government. The court disagrees that South Dakota law prevents the court from adopting Plan C. Indeed, the Eighth Circuit explicitly held that the court had the power to adopt Plan C: "If, at the remedy stage, a redistricting of Martin's wards appears unworkable, it appears that [Plan C] would be a viable option." *Cottier*, 445 F.3d at 1123 n.7. The Eighth Circuit's decision on this matter is the law of the case, and this court is bound to follow it. *See Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 911 (8th Cir. 2005). The court thus concludes that it has the power to adopt Plan C.

*Cottier v. City of Martin*, 475 F. Supp. 2d at 937.

Although the prior panel acknowledged that the *Gingles* analysis dealt only with possible solutions instead of ultimate, viable or stable solutions, the panel also concluded that the district court had the authority to implement Plan C, and the district court stated that it was bound by that holding as law of the case. We realize that the

third *Gingles* factor was at issue in our prior panel decision, and so the statements about Plan C were dicta. However, the prior panel did instruct the district court that on remand, in determining a remedy, "[a]mong its options, the district court has the discretion to implement any of the three plans presented by the plaintiffs." *Cottier I*, 445 F.3d at 1123. We conclude, given the prior panel's instruction, that the district court reasonably believed that it had the discretion to adopt Plan C. We hold that the district court did not abuse its discretion in adopting Plan C.

III. *Conclusion*

For the foregoing reasons, we affirm the judgment of the district court.

COLLOTON, Circuit Judge, dissenting.

After the district court's dismissal of this case was reversed by a divided panel in *Cottier v. City of Martin*, 445 F.3d 1113 (8th Cir. 2006) (*Cottier I*), the district court on remand ruled that the City of Martin was liable for diluting the voting strength of Native Americans, in violation of § 2 of the Voting Rights Act of 1965. *Cottier v. City of Martin*, 466 F. Supp. 2d 1175 (D.S.D. 2006). As a remedy, the district court ordered the City to adopt a municipal government structure that is not authorized by South Dakota law, and to implement an at-large, cumulative voting scheme designed to result in the election of a candidate preferred by Native American voters in each election cycle. *Cottier v. City of Martin*, 475 F. Supp. 2d 932, 936 (D.S.D. 2007).

I would reverse the judgment of the district court. To the extent the plaintiffs made a sufficient showing to justify a finding of liability for vote dilution under § 2, this showing required proof that Native Americans were "sufficiently large and compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). If the record supports that conclusion (the so-called first *Gingles* precondition), then it was unnecessary for the district court to impose a remedy contrary to South Dakota law. The appropriate remedy would have been to

-19-

create a district (or ward) in which Native Americans constitute a majority. The district court concluded, however, that it "could *not* draw a three-ward plan that contains an effective majority of Indian voters in one ward." *Cottier*, 475 F. Supp. 2d at 938. If this conclusion is correct, then there was no liability for vote dilution in the first place, because the first *Gingles* precondition was not satisfied. Accordingly, I would remand the case to the district court with directions either to revisit the finding of liability and dismiss the case if the plaintiffs have failed to meet the first *Gingles* precondition, or to implement a remedy that conforms to South Dakota law by creating a ward in which Native Americans constitute a majority.

The Supreme Court in *Gingles* established three preconditions to a finding of liability under § 2. The first precondition is that the minority group is large enough and geographically compact enough that it would be a majority in a single-member district. 478 U.S. at 50. The Court explained that the reason for this precondition is to ensure that minority voters "possess the *potential* to elect representatives in the absence of the challenged structure or practice." *Id.* at 50 n.17 (emphasis in original). If minority voters are not a sufficiently large and compact group to constitute a majority in a single-member district – "the smallest political unit from which representatives are elected" – then it follows that they have no potential to elect a representative of their choice, and there is no principled basis to find that their voting strength has been "diluted." *Id.*

"To establish the first *Gingles* precondition, a plaintiff must demonstrate a proper and workable remedy exists." *Cottier I*, 445 F.3d at 1117. In *Stabler v. County of Thurston*, 129 F.3d 1015 (8th Cir. 1997), this court recognized that where the plaintiffs fail to present a workable remedy in which "Native Americans are geographically compact to form an effective voting majority in a single-member district," they do not meet the first precondition of *Gingles*, and they fail to establish liability under § 2. *Id.* at 1025. *Stabler* thus echoed the conclusion of other circuits that "[t]he inquiries into remedy and liability . . . cannot be separated," and that "[a]

-20-

district court must determine as part of the *Gingles* threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system." *Nipper v. Smith*, 39 F.3d 1494, 1530-31 (11th Cir. 1994) (en banc); *id*. at 1547 (Edmondson, J., concurring in part and concurring in result); *accord Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996). As the Supreme Court put it in *Growe v. Emison*, 507 U.S. 25 (1993), "[u]nless these points are established, there neither has been a wrong nor can be a remedy." *Id*. at 40-41.

In *Cottier I*, the district court found that the first precondition was satisfied, 445 F.3d at 1117, and a panel of this court, applying a clearly erroneous standard of review, *id*. at 1116, affirmed the district court's finding. *Id*. at 1118. After this court reversed the district court's finding that the third precondition was not established, *id*. at 1122, the district court on remand found that under the totality of the circumstances, the plaintiffs had established vote dilution that violated § 2. 466 F. Supp. 2d at 1199. When it turned to the remedy, however, the district court effectively backtracked on its previous conclusion that the plaintiffs had established the first *Gingles* precondition. At that point, the court concluded that "[r]edistricting Martin's three-ward system will not remedy the § 2 violation," cited an expert who "could not create a three-ward plan in Martin that contained an effective majority of Indians," and found that it "could not draw a three-ward plan that contains an effective majority of Indian voters in one ward." 475 F. Supp. 2d at 938. Once the court found in its remedial analysis that Native Americans were not geographically compact enough to form an effective voting majority in a single-member ward, *Stabler* dictated a corresponding finding that the first *Gingles* precondition was not met, and that the plaintiffs failed to establish a § 2 violation. *Stabler*, 129 F.3d at 1025; *see also Nipper*, 39 F.3d at 1533 ("The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability.").

Rather than revisit its conclusion on liability, however, the district court proceeded to implement an unprecedented remedy – a plan that is "not a municipal government structure authorized by South Dakota law." 475 F. Supp. 2d at 938. Adopting the plaintiffs' Plan C, the court ordered that the City abolish its aldermanic wards and adopt "an at-large voting scheme using cumulative voting." *Id*. at 936. Under this scheme, the City will have "six city council members, elections for which will be held in a 3-3 staggered cycle." *Id*. "Pursuant to the cumulative voting scheme, each voter will receive three votes," and "[e]ach voter can cast one, all, or any whole number of his or her votes for any one or more of the candidates." *Id*. "The winners of the election will be the three candidates that receive the highest number of votes." *Id*. As the district court recognized, however, South Dakota law authorizes only two municipal government structures: (1) a common council form in which the council "consists of the mayor elected at large and two aldermen elected *from and by the voters of each ward* of the municipality," with staggered terms so that "two aldermen are not up for reelection in the same year" (*i.e.*, the City's present form), S.D. Codified Laws § 9-8-4 (emphasis added); or (2) a commission form in which "the board of commissioners shall consist of the mayor and *two or four* commissioners elected at large." *Id.* § 9-9-1 (emphasis added). The district court imposed a hybrid scheme, not authorized by South Dakota law, under which *six* city council members are to be elected *at large*, under a cumulative voting scheme.

Neither the majority nor the district court cites any precedent in which a federal court has ordered a municipality to adopt a governmental structure that is unauthorized by state law as a remedy under § 2 of the Voting Rights Act. The district court, in its decision reviewed in *Cottier I*, concluded that it *did not* have authority to order this remedy. (Order, R. Doc. 371, at 21 n.4). The district court cited *Cane v. Worcester County*, 35 F.3d 921 (4th Cir. 1994), which reversed a district court's decision to adopt an at-large cumulative voting scheme that abolished residency districts, because the court failed to give due deference to contrary legislative judgments about an appropriate voting plan. *Id*. at 927-29; *see also Cane*

*v. Worcester County*, Nos. 95-1122, 95-1688, 1995 WL 371008, at *3 (4th Cir. June 16, 1995) (directing the district court to adopt a different plan that came "closer to satisfying all of the legislative goals expressed by the County"). The district court in this case reversed course on remand, however, because it felt bound by *dicta* from a footnote in *Cottier I*, which said "it appears that plaintiffs' third plan would be a viable option." 445 F.3d at 1123 n.7. The majority on this appeal provides no independent analysis, relying exclusively on the footnote in *Cottier I*. *Ante*, at 17-19. For their part, the plaintiffs assert that the district court "plainly erred" by refusing to deem viable both plaintiffs' Plan A, which divided the city into three dual-member wards, and thus conformed to South Dakota's common council form of government, *see* S.D. Codified Laws § 9-8-4, and Plan B, which divided the city into six single-member wards, but the plaintiffs maintain that the district court nonetheless had discretion to adopt Plan C. (Appellees' Br. 46).

The Supreme Court has declared that federal courts in voting rights cases "should follow the policies of the preferences of the State, as expressed in statutory and constitutional provisions or in the . . . plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973); *see also Whitcomb v. Chavis*, 403 U.S. 124, 160-61 (1971) (holding that a district court erred in fashioning a plan that rejected state policy choices "without solid constitutional or equitable grounds for doing so"). Thus, at least two circuits have opined that district courts applying § 2 "must to the greatest extent possible give effect to the legislative policy judgments underlying the current electoral scheme or the legally unacceptable remedy offered by the legislative body." *Cane*, 35 F.3d at 928; *accord Harper v. City of Chi. Heights*, 223 F.3d 593, 602 (7th Cir. 2000); *see also Nipper*, 39 F.3d at 1531 ("Implicit in [the] first *Gingles* requirement is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system."). These observations are bolstered by the Supreme Court's decision in *Holder v. Hall*, 512 U.S. 874 (1994), which established that the size of a governing

body is not subject to a vote dilution challenge under § 2. "*Holder* also confirms that, from the inception of a section 2 case, the existence of a workable remedy within the confines of the state's system of government is critical to the success of a vote dilution claim." *Nipper*, 39 F.3d at 1533.

These authorities indicate strongly that a federal court may disregard state law in remedying a violation of § 2 only as a last resort. The plaintiffs here essentially concede an abuse of discretion by urging that the district court could have adopted Plan A or Plan B as a remedy for the purported violation. If the plaintiffs have satisfied the first *Gingles* precondition that Native American voters constitute a geographically compact majority in a single-member ward, then a "proper and workable remedy" presumably would have been to create such a ward, and it was an abuse of discretion for the district court to impose a municipal government structure that contravenes state law, rather than a remedy that follows the policy preferences of the State.

The problem of overriding state law concerning the structure of municipal government is compounded by the district court's imposition of a cumulative voting scheme. The plaintiffs cite no authority that cumulative voting in municipal elections is authorized by South Dakota law, and the relevant statute indicates that it is not. *See* S.D. Codified Laws § 9-13-21 ("If more than one member of the governing body is to be elected, the ballot shall contain instructions as to *how many candidates for the governing body are to be voted for*."). As others have noted, moreover, "the effect and, proponents would argue, the strength of cumulative voting" is that it will achieve proportional representation of protected classes. *Cousin v. Sandquist*, 145 F.3d 818, 829 (6th Cir. 1998). Because "[t]he imposition of cumulative voting is thus meant to achieve an end not contemplated in the Voting Rights Act," *id.*, its appropriateness as a remedy for a violation of § 2 is dubious. *See id.* ("[W]e feel that cumulative voting, the remedy ordered by the district court in this case, is an inappropriate remedy for a Section 2 claim . . . ."); *Cane*, 35 F.3d at 928 (holding that district court abused its

discretion in adopting a cumulative voting scheme).  The *dicta* in *Cottier I* did not address the tension between the specific prohibition on use of the Voting Rights Act to achieve proportional representation, 42 U.S.C. § 1973(b), and the natural effect (and perhaps design) of a cumulative voting scheme.[9]  The only authority offered by the plaintiffs in support of cumulative voting is the statement of Justice Thomas in *Holder*, that "nothing in our present understanding of the Voting Rights Act places a principled limit on the authority of federal courts that would prevent them from instituting a system of cumulative voting as a remedy under § 2,"  512 U.S. at 910 (Thomas, J., concurring in judgment) – a statement that read in context can hardly be taken as a ringing endorsement of the remedy.  *See id.* at 908-14 (observing that changes such as cumulative voting or a system using transferable votes "may seem radical departures from the electoral systems with which we are most familiar," and "may be unwanted by the people in the several States who purposely have adopted districting systems in their electoral laws," and urging that the Court's interpretation of the Voting Rights Act should be systematically reexamined).

In summary, this case in several respects represents a remarkable assertion of authority by a federal court of appeals under § 2 of the Voting Rights Act:

- The panel majority in *Cottier I* declared clearly erroneous the district court's refusal to give decisive weight to unreliable exit poll data and other equivocal election data, in the face of Supreme Court guidance that vote dilution claims are "peculiarly dependent upon the facts of each case," and require "an intensely local appraisal of the design and impact

---

[9] *Cottier I* distinguished the Fourth Circuit's decision in *Cane* on the ground that the plan in that case "completely eliminated elected positions," 445 F.3d at 1123 n.7, presumably by abolishing residency districts and "imposing a plan that would permit all five seats on the Board to be filled by individuals living in the same general area of the County."  *Cane*, 35 F.3d at 929.  The remedy adopted by the district court in this case, however, similarly abolishes the wards in Martin, and provides that all six council members will be elected at large.

of the contested electoral mechanisms." *Gingles*, 478 U.S. at 79 (internal quotations omitted).

• The majority opinion on this appeal affirms a determination of liability under § 2, despite the district court's finding that it "could not draw a three-ward plan that contains an effective majority of Indian voters in one ward," 475 F. Supp. 2d at 938, thus generating an intra-circuit conflict with *Stabler*, 129 F.3d at 1025, and an inter-circuit conflict with cases holding that the first *Gingles* precondition means that the inquiries into remedy and liability cannot be separated. *See Sanchez*, 97 F.3d at 1311; *Nipper*, 39 F.3d at 1530-31.

• The majority opinion on this appeal, applying dicta from *Cottier I*, upholds as a remedy under § 2 the imposition of a municipal government structure that is not authorized by state law, and becomes the only published authority to approve the imposition of cumulative voting as a remedy for a violation of § 2.

I respectfully dissent.

_____